**IN THE UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF ARKANSAS**
**PINE BLUFF DIVISION**

**RANDY BENNETT and**
**RICHARD TURNEY**                                                   **PLAINTIFFS**

**VS.**                              **NO.  5:11CV00104-JMM**

**RICELAND FOODS, INC.**                                       **DEFENDANT**

<u>**ORDER**</u>

        Pending is Defendant's motion for summary judgment (docket # 7).  Plaintiffs have filed

a response and Defendant has replied.  For the reasons stated below, Defendant's motion for

summary judgment is DENIED.

<u>Facts</u>

        Plaintiffs, Randy Bennett and Richard Turney claim that they were retaliated against in

violation of Title VII of the Civil Rights Act of 1964, as amended ("Title VII"), 42 U.S.C.

§2000e, *et. seq*.; 42 U.S.C. §1981; and the Arkansas Civil Rights Act ("ACRA"), A.C.A. §16-

123-101, *et. seq*. when their positions were eliminated with Riceland Foods, Inc. ("Riceland").

Riceland argues that it is entitled to summary judgment on Plaintiffs' claims.

        Plaintiff, Randy Bennett was hired by Riceland in July 2004, to work in the clean rice

shipping department.  He was hired to do general maintenance and worked on forklifts along

with other mechanical maintenance responsibilities.  Bennett claims that over time, his job began

to include working on everything, including other non-rolling-stock equipment.  On June 30,

2009, Bennett was advised by the Director of Warehousing, Packaging and Shipping, Marty

Jones, and a  Riceland Human Resource Manager, David Hoover, that effective July 31, 2009,

his position was being eliminated and he would be laid off.  Bennett was told that the reason for

his job elimination was that the forklift work that he had been doing was going to be turned over

to an outside contractor, Hugg & Hall.  He was also advised that the job elimination was to save money.  Bennett claims that after a co-worker, Richard Turney, complained about Crane's use of inappropriate language which he witnessed, Marty Jones asked him if he was trying to ruin Crane's career.  Jones also asked Bennett if he wanted Crane fired.

Turney was hired by Riceland on March 4, 2002.  He originally worked in the parboil department and then moved, at his request, to maintenance in clean rice shipping.  Turney claims that his job required him to work on almost all of the equipment in the sewn, the parboil and the clean rice shipping department.  Turney claims that his problems with Riceland began when supervisor, Ralph Crane, used racial statements in the workplace.  Turney made multiple complaints regarding Crane.  Turney is not aware of any discipline Crane received as a result of his complaints.  Turney was advised of his job elimination by Marty Jones on or about June 30, 2009.

Turney filed several grievances with Riceland.  One grievance, filed April 20, 2009, alleged that Turney's supervisor, Ralph Crane, had used the "n" word on numerous occasions and that he found it to be offensive. Bennett was identified as a witness of the alleged inappropriate language used by Crane.  In response to the complaint, Riceland's Director of Human Resources, Linda Dobrovich interviewed both Turney and Bennett along with several others.  The investigation of Turney's complaint occurred, in part, in May 2009.

Plaintiffs admit that Linda Dobrovich, as Human Resources Director for Riceland, testified that she  reviewed Turney's complaint and investigated the allegations in May 2009. After her investigation, she recommended that Crane receive diversity training, that he be counseled concerning the use of inappropriate language in the workplace, and advised that if he

used the language again, he would be fired.  Plaintiffs deny that these statements are true.

Ms. Dobrovich also testified that in May 2009, the CEO of Riceland sent out a directive to all of the department managers that there needed to be cost reductions in the various departments at Riceland.  Managers of all divisions were directed, according to Ms. Dobrovich, to review their use of personnel and to find ways to reduce costs.  This was carried out corporate-wide in all of the various divisions, including the corporate headquarters where Ms. Dobrovich worked. Ms. Dobrovich testified that there were three people doing maintenance work who were not assigned to the maintenance department. Turney and Bennett were assigned to shipping and warehouse and another person, Tony Sayger, was assigned to the packaging department.  All three of these jobs were eliminated in 2009 and all in-house maintenance work was assigned to the Central Maintenance Department.  Plaintiffs admit that Ms. Dobrovich testified as stated, but again, deny the truth of her testimony.

Riceland claims that upper management, including Dobrovich, reviewed the proposed job eliminations in clean rice shipping and approved the eliminations.  Dobrovich was aware that Mr. Bennett and Mr. Turney had made complaints about their supervisor at the time that she reviewed the proposed job eliminations. She testified that Riceland was outsourcing maintenance of forklifts at all of its other locations. She was advised by David Hoover, HR manager at the Rice Division, and Scott Lindsey, Rice Division Manager, that it would be cost effective at the Stuttgart Rice Division to do the same. She personally called the other divisions to determine whether they were in fact outsourcing their forklift maintenance and those divisions confirmed that they were doing so. They also confirmed that it was cost effective. Ms. Dobrovich testified that she felt based on her investigation that this was a good business decision and she approved it

from an HR standpoint to both Mr. Lindsey and Mr. Hoover, prior to the job eliminations being announced.   Plaintiffs deny the truth of these statements.

Pursuant to the directive from the CEO of the company, Marty Jones, who was hired March 31, 2008 as Director of Warehousing, Packaging and Shipping in the Rice Division, began exploring the possibilities of job eliminations in order to decrease costs. Subcontracting out some of the maintenance work at the rice division to third parties had been explored in 2008.

After receiving the directive from the CEO, Mr. Jones reviewed bids from outside contractors, one specifically being Hugg & Hall, to maintain the forklifts in Riceland's Rice Division, including clean rice shipping. He estimated that by eliminating maintenance jobs in clean rice shipping that there would be a savings of approximately $76,000.00 to Riceland. Consequently, he recommended to his superiors that Mr. Bennett's and Mr. Turney's jobs be eliminated and that the forklift maintenance be outsourced to a third party. It was also his recommendation that central maintenance absorb the additional maintenance responsibilities that were being performed by Mr. Bennett and Mr. Turney. Mr. Jones testified that Ralph Crane had nothing to do with the job elimination decision.  Mr. Jones testified that he took into consideration fiscal considerations and research into alternatives that would be more cost effective.   Mr. Jones also testified that cost considerations were the only factor in the decision to eliminate the two positions.  Plaintiffs admit that Jones was hired in 2008 as the WPS Director and that he testified to the matters outlined above, but Plaintiffs deny the truth of his assertions.

**Plaintiffs' additional allegations**:

Plaintiffs affirmatively state, in part, that during most of their employment at Riceland they were supervised by Rick Chance.  After Jones became the WPS Director in March 2008,

Bennett and Turney were reassigned to work for Ralph Crane. Bennett and Turney objected to Crane's use of abusive and racially derogatory language. Plaintiffs claim that Crane worked under Rick Chance for several years and during this time Chance had problems with Crane using offensive language. Chance counseled Crane about his use of derogatory language and racial slurs in the workplace as early as 1997.

Turney filed a formal grievance against Crane on April 3, 2009. In this complaint, Turney complained that Crane used racially charged statements, including that Crane had said in front of several people that a coworker "smelled like a nigger." Crane responded to the grievance by stating that he had "no recollection of having made these statements." On April 8, 2009, Turney appealed the grievance to the WPS Director, Martin Jones. Turney also filed another grievance on April 8, 2009, wherein he reported an incident in which Crane had become upset because a white female employee had a reputation for dating African American men; Turney accused Crane of saying " I don't know why these little white whores want to be fucking these goddamn niggers."

Following Jones investigation of Turney's initial complaint, Jones concluded that the offense had not been committed and the grievance had no merit. Turney appealed Jones decision to Scott Lindsey. Lindsey determined that the grievance had no merit. Turney claims that because he was unsatisfied with the response to his first grievance and having received no response from his second grievance, he initiated the grievance procedure for a third time on April 20, 2009. On April 21, 2009, Crane wrote that he had responded to the second grievance on April 9, by denying that the statement was made. On the same day, Jim Trice told Turney that it appeared that his second grievance had been lost. Bennett went outside the WPS

department and filed his own complaint directly to the HR Director, Linda Dobrovich, wherein he echoed Turney's complaints about Crane.

Plaintiffs claim that Martin Jones confided in Rick Chance that he was upset with Bennett and Turney over the racial complaints that they were making against Crane.   Jones allegedly told Chance that he was frustrated that he was unable to get Bennett and Turney to "play ball" and drop the complaints.

On May 6, 2009, Jones met with Bennett and referencing Bennett's and Turney's recent complaints against Crane, suggested that Bennett might be happier working in another location. On May 8, 2009, Turney wrote Dobrovich complaining about how his grievances were being handled.  Plaintiffs claim that Dobrovich investigated their complaints between May 15 and 18, 2009.  Plaintiffs claim that everyone interviewed, with the exception of Crane, supported their allegations about Crane's behavior.

In early June 2009, after Dobrovich concluded her investigation, Jones met again with Bennett.  Jones described the meeting as confrontational.  Jones discussed his perception that Bennett was unhappy with his job and reiterated that there were other jobs available for Bennett elsewhere.

On June 30, 2009, Bennett and Turney were informed that "the maintenance of all 'rolling stock' would be out-sourced to a vendor, that all other regular maintenance would be shifted to Central Maintenance," and that these changes would result in Bennett and Turney being laid off.   Plaintiffs claim that Jones told Bennett and Turney that both he and the Human Resource Department would make sure that they were informed of any potential vacancies within the company.    Bennett was told about a position at a plant in Holly Grove, Arkansas.

6

When he checked on the position, he was told that they were not certain that the position would be filled.  Bennett also found out about a maintenance position in Stuttgart, but when he inquired about he position, the notice was rescinded.  Turney checked to see if any positions were available, but found none that were viable for him.  Bennett and Turney were never informed of any other positions available in the company within a reasonable driving distance of their homes.

Plaintiffs claim that they were the only skilled maintenance workers who had their jobs eliminated at this time.  Of the maintenance team members supervised by Crane in mid-2009, several had less seniority and less experience than Plaintiffs.  Some workers had only been on the job for a few weeks or months and were still in training at the time Plaintiffs' positions were eliminated.   After Plaintiffs were terminated, another maintenance worker, Clayton Sharp, was hired.   After Plaintiffs separated from Riceland, another former member of the team, testified that about six weeks after Bennett and Turney lost their jobs, Crane told him that "anyone who witnessed against him would lose their job like the two that already had."

Standard for Summary Judgment

Summary judgment is appropriate only when there is no genuine issue of material fact, so that the dispute may be decided solely on legal grounds.  *Holloway v. Lockhart*, 813 F.2d 874 (8th Cir. 1987);  Fed. R. Civ. P. 56.  The Supreme Court has established guidelines to assist trial courts in determining whether this standard has been met:

> The inquiry performed is the threshold inquiry of determining whether there is a need for trial -- whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party.

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).

Case 5:11-cv-00104-JMM   Document 24   Filed 02/15/12   Page 8 of 10

The Eighth Circuit Court of Appeals has cautioned that summary judgment should be invoked carefully so that no person will be improperly deprived of a trial of disputed factual issues. *Inland Oil & Transport Co. v. United States*, 600 F.2d 725 (8th Cir. 1979), *cert. denied*, 444 U.S. 991 (1979). The Eighth Circuit set out the burden of the parties in connection with a summary judgment motion in *Counts v. M.K. Ferguson Co.*, 862 F.2d 1338 (8th Cir. 1988):

> [T]he burden on the moving party for summary judgment is only to demonstrate, *i.e.*, '[to] point out to the District Court,' that the record does not disclose a genuine dispute on a material fact. It is enough for the movant to bring up the fact that the record does not contain such an issue and to identify that part of the record which bears out his assertion. Once this is done, his burden is discharged, and, if the record in fact bears out the claim that no genuine dispute exists on any material fact, it is then the respondent's burden to set forth affirmative evidence, specific facts, showing that there is a genuine dispute on that issue. If the respondent fails to carry that burden, summary judgment should be granted.

*Id.* at 1339. (quoting *City of Mt. Pleasant v. Associated Elec. Coop.*, 838 F.2d 268, 273-274 (8th Cir. 1988) (citations omitted)(brackets in original)). Only disputes over facts that may affect the outcome of the suit under governing law will properly preclude the entry of summary judgment. *Anderson*, 477 U.S. at 248.

<u>Discussion</u>

Plaintiffs' claims for retaliation under 42 U.S.C. § 1981, Title VII, and the Arkansas Civil Rights Act are governed by the same standard. *See, McCullough v. Univ. of Ark. For Med. Scis.*, 559 F.3d 855, 864 (8th Cir. 2009)(noting ACRA contains nearly identical prohibition against retaliation as Title VII); *See also, Gacek v. Owens & Minor Distribution, Inc.* , _____ F. 3d ___, 2012 WL 246524 (8th Cir. 2012)(Section 1981 claims are analyzed under the same framework as Title VII claims). Under that framework, if the plaintiff can establish a *prima*

*facie* retaliation case, the defendant must provide a legitimate, nondiscriminatory reason for its decision. If the defendant does so, the burden then shifts back to the plaintiff to show that the proffered reason was merely a pretext for discrimination. *Id*.

A plaintiff may establish a *prima facie* case of retaliation by showing that (1) the plaintiff engaged in a statutorily protected activity, (2) an adverse employment action was taken against him, and (3) a causal connection exists between the two events. *Gilooly v. Missouri Dept. of Health and Senior Services*, 421 F.3d 734, 739 (8th Cir. 2005). Defendant concedes for purposes of its motion for summary judgment that Plaintiffs' job elimination is an adverse employment action. Further, Defendant admits that Plaintiffs engaged in a statutorily protected activity when they complained about racially derogatory language. Defendant contends that Plaintiffs' claim fails because they offer no evidence to show a causal connection between their job elimination and the protected activity in which they engaged. Further, Defendant claims that they have offered a legitimate, non-discriminatory reason for the action taken; that being a directive from top management to cut costs, and Plaintiffs can present no evidence of pretext. The Court disagrees.

The Court finds that the Plaintiffs have presented sufficient evidence of a causal link between their complaints of Crane's use of racially derogatory language and their job elimination to preclude summary judgment. Further, the Court finds Plaintiffs' evidence sufficient to create a genuine issue of material fact on the issue of pretext. Plaintiffs' complaints in April 2009 and the investigation of those complaints through May 2009, establishes only a matter of weeks between the protected activity and the date on which the Plaintiffs were advised that their jobs were being eliminated. Additionally, Plaintiffs present evidence that Jones, one of

the decision makers, was upset and frustrated with Plaintiffs' complaints.  Jones met with Bennett on May 6, 2009, attempted to get him to withdraw his complaint, asked if he was trying to ruin Crane's career and suggested that Bennett might move to another position.  Bennett again met with Jones on May 25, 2009 in a meeting which Jones described as confrontational.  Further, Plaintiffs present evidence that they were the only skilled maintenance employees who had their jobs eliminated at this time when the positions of other employees with less seniority and experience were not eliminated.  Plaintiffs also offer the testimony of Tony Sayger who states that about six weeks after the Plaintiffs were separated from Riceland, Crane stated "that anyone who witnessed against him would lose their job like the two that already had."

Considering the evidence in the light most favorable to the Plaintiffs, the Court finds that genuine issues of material fact preclude the entry of summary judgment.  Accordingly, Defendant's motion for summary judgment is DENIED.

IT IS SO ORDERED this 15th day of February, 2012.


James M. Moody
United States District Judge